## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE: | ) | No. 14-MD-2543 (JMF) |
| | ) | |
| GENERAL MOTORS LLC IGNITION | ) | Case No.: 1:18-cv-3825 |
| SWITCH LITIGATION | ) | |
| | ) | |
| This Document Relates to: | ) | AMENDED COMPLAINT |
| | ) | |
| LEZLI MYERS, individually | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GENERAL MOTORS LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Pursuant to Order No. 146 (Docket No. 5301) and Order No. 144 (Docket No. 5296), Plaintiff Lezli Myers (hereinafter "Plaintiff" or "Named Plaintiff"), through the undersigned counsel, now files her Severed and Amended Original Complaint (*see* Docket No. 1:16-cv-02391-JMF) and would respectfully show as follows:

### PRELIMINARY STATEMENT

1.      The Named Plaintiff's cause of action is brought solely against GENERAL MOTORS, LLC ("New GM" or "Defendant"). References to General Motors Corporation, Old GM, or pre-sale order conduct in this Complaint are for background and reference purposes, and also to establish the genus of Old-to-New employees' knowledge of the safety defects described herein as well as said employees' wrongful, negligent actions and inactions with respect to the same. Under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement

("Purchase Agreement"), New GM acquired certain Old GM assets and product liabilities, including product liability for crashes involving Old GM vehicles causing personal injury, loss of life, or property damage.  New GM also acquired knowledge of Old GM's activities and the common defects in the Electric Power Steering ("EPS") system, as well as other serious defects identified herein, via the mind of the employees, officers, managers, books, and records obtained and/or acquired as a result of the Purchase Agreement and subsequent Sale Order, as further defined by the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in Motors Liquidation Company, et al., f/k/a General Motors Corp., et al., Case No. 09-50026 (REG).  Thus, the duties of Old GM are part of the foundation for the product liability assumed by New GM, as the Named Plaintiff bases her claims on a crash involving an Old GM vehicle which, due to Old and New GMs wrongful, negligent actions and inactions, caused her personal injury, loss of life, or property damage and new GM is, therefore, liable to the Named Plaintiff.

## PARTIES, JURISDICTION, AND VENUE

2.    The Named Plaintiff Lezli Myers is and was at all times relevant a resident and citizen of the State of Texas.

3.    The Named Plaintiff asserts claims against Defendant General Motors LLC ("New GM") for personal injuries stemming from an incident which occurred on September 25, 2009 in Polk County, Texas.

4.    The Named Plaintiff's personal injury claim involves a Defective Vehicle, specifically a 2006 Chevrolet Malibu. As used herein, the "Defective Vehicles" include the vehicles subjected to NHTSA Recall No. 14V-153 involving over 1.3 million GM vehicles that were recalled for common defects in the Electric Power Steering system, as well as those vehicles recalled under NHTSA Recall No. 10V-073 for similarly common EPS defects. The models

affected by the 14V-153 Recall are: 2004-2006, 2008-2009 Chevrolet Malibu, 2004-2006 Chevrolet Malibu Maxx, 2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2008-2009 Saturn Aura, 2004-2007 Saturn Ion, and 2005-2009 Pontiac G6. The models affected by the 10V-073 Recall are the following vehicles equipped with EPS: 2005-2010 Chevrolet Cobalt, 2005 Pontiac Pursuit, 2005-2006 Pontiac G4, 2006 Pontiac G5 Pursuit, and 2007-2010 Pontiac G5. "Defective Vehicles" also refers to those vehicles subject to NHTSA Recall No. 14V-252.  In the vehicles that fall under NHTSA Recall No. 14V-252, the brake lamps may fail to illuminate when the brakes are applied or illuminate when the brakes are not engaged; the same defect can disable cruise control, traction control, electronic stability control, and panic brake assist operation, thereby increasing the risk of collisions and injuries.

5.     Defendant GENERAL MOTORS LLC is not a citizen of the state mentioned above. General Motors LLC is (and was at the time this lawsuit was filed) a Delaware limited liability company with its principal place of business in Michigan.  General Motors LLC's sole member and 100 percent owner is General Motors Holdings LLC, which is also a Delaware limited liability company with its principal place of business in Michigan. General Motors Holdings LLC's sole member and 100 percent owner is Defendant General Motors Company, which is (and was at the time this lawsuit was filed) a publicly traded Delaware corporation with its principal place of business in Michigan, making General Motors LLC a citizen and resident of Delaware and Michigan.

6.     With respect to the facts alleged and claims asserted in this Complaint, New GM is the corporate successor of General Motors Corporation ("Old GM"), which filed a voluntary Petition for relief under Chapter 11 of the U.S. Bankruptcy Code on June 1, 2009.  (General Motors Corporation and General Motors LLC will be collectively referred to as "GM").  On or about July 10, 2009, New GM acquired substantially all of the  assets and assumed certain

liabilities of Old GM by way of a Section 363 sale under Chapter 11 of the Bankruptcy Code. Plaintiff's causes of action in this lawsuit are brought against New GM for acts or omissions that occurred after July 10, 2009, and Plaintiff does not assert any causes of action against Old GM. Although this Complaint references facts against Old GM, it is for background and reference purposes only. At all times relevant to the claims in this lawsuit, GM has been in the business of developing, manufacturing, and marketing cars throughout the states listed herein and the entire United States of America.

7.     Complete diversity exists between Plaintiff and Defendant. Plaintiff is seeking damages in excess of $75,000.00, exclusive of interest and costs. Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1332 and/or 28 U.S.C. § 1331 . Further, all claims are timely filed under the applicable state law from the date of accident or the date of recall, or other applicable date. Further, any allegedly applicable statute of limitation or statute of repose should be equitably or lawfully tolled or the Defendant equitably estopped from asserting any such affirmative defense or claim due to Defendant's purposeful and fraudulent concealment of the defects, which are subject of this lawsuit. Plaintiff could not have known or been on reasonable notice of the Defendant's illegal conduct or the defects until she received actual notice of the applicable vehicle recall. Defendant's lack of timely recalls and failure to notify the U.S. Government of the accidents and injuries leading up to the recalls was done to dissuade or prevent civil claims against Defendant. As set forth more fully below, Defendant has unclean hands from its own behavior from July 10, 2009 to the present that should prevent its assertion of any statute of limitation or statute of repose affirmative defense.

8.     Pursuant to the Court's instructions, Plaintiff may file directly in the MDL court and reserve the right to have filed in another district. Plaintiff filed in this District in order to advance the efficient and orderly resolution of claims arising from Defendant's conduct and its

attendant nationwide devastating effects. Filing in this District does not alter the choice-of-law analysis and does not waive Plaintiff's rights to transfer to another district at the conclusion of pretrial proceedings in this case. Therefore, this Complaint is filed by Plaintiff as if she had filed in the district in which her accident occurred, or other lawful jurisdiction.

9.    This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction. This Court has personal jurisdiction over New GM because New GM conducts substantial business in this District, and upon information and belief, consents to jurisdiction.

10.    Venue is proper in this District under 28 U.S.C. § 1391 because New GM, as a corporation, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.

11.    Plaintiff Lezli Myers originally filed her causes of action against Defendant in Lakhani et al. v. General Motors LLC (Case No. 1:16-cv-02391-JMF).

## BACKGROUND FACTS

### A.  General Background

12.    Plaintiff Lezli Myers was operating a 2006 Chevrolet Malibu, manufactured and sold by Defendant, on September 25, 2009.  The vehicle's VIN is 1G1ZT51F36F166798.  On that date, Plaintiff Lezli Myers was traveling southbound on US 59 in Polk County, Texas.  As Plaintiff Lezli Myers was traveling, due to the defects alleged herein, she lost control of the vehicle.  This caused the vehicle to cross over the southbound lane, leave the roadway, and roll.  Upon information and belief, Plaintiff's electronic power steering failed and caused Plaintiff to lose control of her vehicle, and resulted in the crash that is the subject of this lawsuit.  Defendant's defects as alleged herein were the direct and proximate cause of her injuries.

13.    As a result of the collision described above, the Named Plaintiff suffered serious physical injuries and Defendant's defects as alleged herein were the direct and proximate cause of these injuries. These injuries include, but are not limited to, injuries to her head, neck, back, chest,

and arm.

14.     An automaker should never place profits above safety and should never conceal from consumers or the public any defects that exist in its vehicles.  New GM's Vehicle Safety Chief, Jeff Boyer, has proclaimed that "Nothing is more important than the safety of our customers in the vehicles they drive."   GM Announces New Vehicle Safety Chief, available at http://democrats.energycommerce.house.gov/sites/default/files/documents/Testimony-Barra-GM-Ignition-Switch-Recall-2014-4-1.pdf.

15.     Indeed, the first priority of a car manufacturer should be to ensure that its vehicles are safe and, in particular, have functioning EPS and other safety systems/features that can prevent or minimize the threat of death or serious bodily harm in a collision.  In addition, a car manufacturer must take all reasonable steps to ensure that once a vehicle is running, it operates safely, and its critical safety systems (such as EPS) work properly until such time as the driver shuts down the vehicle.  Moreover, a manufacturer that is aware of a dangerous design defect that causes the vehicle to suddenly and unexpectedly revert to manual steering must promptly disclose and remedy such defects.

16.     To date, Old GM and New GM have designed, manufactured, marketed and/or sold more than a million automobiles installed with defective steering systems in General Motors brand vehicles.

17.     In addition, or in the alternative, Old GM and New GM have sold millions of vehicles suffering from other, similar, potentially life-threatening major defects.  As will be shown at trial, all the knowledge of Old GM with respect to these defects was inherited by or is imputable to New GM within the meaning of the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in Motors Liquidation Company, et al., f/k/a General Motors Corp., et al., Case No. 09-50026 (REG).

**B.  The Power Steering Defects (Recall No. 14V153)**

18.      In April 2014, New GM announced the issuance of NHTSA Recall No. 14V-153 involving over 1.3 million GM vehicles that were recalled for common defects in the EPS system. The models affected are: 2004-06, 2008-09 Chevrolet Malibu, 2004-06 Chevrolet Malibu Maxx, 2009-10 Chevrolet HHR, 2010 Chevrolet Cobalt, 2008-09 Saturn Aura, 2004-07 Saturn Ion, and 2005-09 Pontiac G6. The Cobalt, HHR, and Ion share a common vehicle platform (the so-called "Z-Car" platform, which technically includes both Delta and Kappa platform vehicles). The Malibu, Aura, and G6 share the Epsilon platform (also sometimes called the "A-Car" platform). As New GM described the defects, "[t]he subject vehicles equipped with electric power steering (EPS) may experience a sudden loss of power steering assist that could occur at any time while driving," with the result that steering could require greater driver effort at low speeds and "could result in an increased risk of a crash."  When EPS is lost, a message is usually displayed on the Driver Information Center ("DIC") and a chime sounds to "notify" the driver, however such notification can hardly truly be considered "notice" when an individual is driving an automobile and suddenly loses the ability to properly steer. The defect can be caused by oil intrusion into the motor case which shorts the commutator and disables the EPS motor; the same short can also be caused by sulfur contamination to the EPS resistors, which also disables EPS functionality.  When the defective condition manifests, power steering assist is completely lost.

19.      Old and New GM were aware of the Power Steering Defect long before the 2014 recall.  In 2003, GM began receiving customer complaints regarding loss of power steering in Ions. It did not investigate, but NHTSA opened a Preliminary Investigation into the 2004 Malibu and informed GM that "[t]his office has received eight (8) reports of electric power steering failure in MY 2004 Chevrolet Malibu vehicles."   In response to NHTSA's information request, GM identified two factors contributing to EPS malfunction—electrical noise and grease contamination

of torque and position sensor.

20.     As of May 18, 2004, GM reported 1,552 customer complaints and 3,786 warranty claims for steering column/motor replacement in 2004 Malibus and Ions. At this time, it was GM's position that vehicles without power steering could be "steered in a safe and controlled manner" – a position at odds with New GM's 2014 decision to recall these vehicles because of a defect affecting motor vehicle safety.

21.     In July 2004, NHTSA upgraded its review of the 2005 Malibu loss of EPS to an Engineering Analysis, advising GM that NHTSA had received 1,818 complaints of a malfunction, failure, or unsatisfactory performance of the EPS system in the 2005 Malibu, with seven crashes/fires and two injuries. An internal GM Field Performance Evaluation Report prepared in 2004 indicated that "[t]he GM Lead Design Release Engineer discovered the condition during a review of Technical Assistance Center (TAC) cases in November 2003, when the rate of loss of power steering assist documented (TAC cases) in the Technical Assistance System was about two to three occurrences per week. By the end of December 2003, the rate was approximately 50 TAC cases per week."

22.     In 2004, Old GM instituted a "Customer Satisfaction Program" for 2004 Malibus in which dealers were instructed to "inspect the steering column, and if necessary, replace it" if a customer came in with a complaint. The letters informing consumers of the Customer Satisfaction Program did not advise them that a defect affecting motor vehicle safety existed, as would be done in a safety recall. NHTSA closed its preliminary investigation in May 2005, noting that it would "continue to monitor complaints and other information relating to the alleged defect in the subject vehicles and take further action in the future if warranted by the circumstances." Despite acknowledging the problem, Old GM did not initiate a recall, although these vehicles would be included in Recall No. 14V-153 ten years later.

23.     Although the Malibu shared the same vehicle "platform" as the Aura and G6, with all three models having substantially similar power steering systems, Old GM took no action with respect to the Aura and G6 at the time of the November 2004 Customer Satisfaction Program for the Malibu. But in April 2007, NHTSA opened a Preliminary Investigation into a potential EPS defect in 2005-06 Pontiac G6s, reporting 4,145 complaints potentially related to failure of the EPS system (including nine crashes/fires and one injury incident). In its response to NHTSA's information request, Old GM reported 1,886 complaints and 4,651 warranty claims potentially associated with a loss of power steering in model year 2005 through 2006 Pontiac G6s. Old GM maintained that no safety issue was presented, but ultimately extended warranty coverage for the 2005-06 G6 and 2005 Malibu and Malibu Maxx to replace the steering column assembly; however, no safety recall was initiated. Like the 2004 Malibus, the 2005 G6 (as well as some 2006 G6s and all 2008-09 G6s) would be recalled ten years later as part of Recall 14V-153.

24.     In the June-September 2006, Old-to-New GM engineer Steven Oakley opened two PRTS files regarding GM's investigation into loss of power steering assist in Chevrolet Cobalt and Pontiac Pursuit vehicles. GM assigned the issue a severity level of 2, which encompasses issues that could cause the customer to return the vehicle to the dealership or cause excessive cost or labor impact at the assembly plant, but is not a safety issue. The file indicates that GM investigators conducted a warranty part return review on July 27, 2006, to analyze returned Cobalt and Pursuit steering columns that were replaced due to complaints of inoperative EPS. Old-to-New GM warranty specialist William Chase noted that 25% of the warranty complaints for 2006 Cobalts and Pursuits were for inoperative power steering. These investigations were ultimately closed without action, and in doing so, the investigative "champion" and supplier quality manager Samuel Dowdell explained that, "The failure could not be reproduced. Based on the test results I am closing this PRTS without action."

9

25.     In August 2007, Old GM issued Technical Service Bulletin #07-02-32-007 to dealers (but not consumers) providing them with "diagnostic tips" for when "Z-Car" platform customers came in complaining of inoperative power steering. The Bulletin was entitled, "Diagnostic Tips for Power Steering Inoperative/Steering Wheel Hard to Turn, Power Steering Message Displayed on DIC, DTCs C0176, C0475, C0476, C0550, U2105, U2107 Set – (Aug 20, 2007)," and applied to the 2005-08 Chevrolet Cobalt, 2006-08 Chevrolet HHR, 2005-06 Pontiac Pursuit (Canada only), 2007-08 Pontiac G5, and 2003-07 Saturn Ion. The recommended service procedures were clearly geared towards saving money and avoiding replacement of the steering column as often as possible. See, e.g., GM-MDL2543-005567358, Aug. 20, 2007 TSB 07-02-32-007, at -7358-59 ("If the codes do not reappear after a test drive, return the vehicle back to the customer and DO NOT replace the steering column.").

26.     In October 2007, the GM Executive Field Action Decision Committee ("EFADC") approved a "Special Coverage" for the 2005 G6 and Malibu/Malibu Maxx for vehicle owners who came in complaining of loss of EPS. This is particularly notable in light of the fact that these vehicles were not included in the later Cobalt EPS recall in March 2010, and ultimately not recalled until 2014. Moreover, customers were "notified" by a letter from GM expressly stating, **"Do not take your vehicle to your GM dealer as a result of this letter unless you believe that your vehicle has the condition as described above."**

27.     In January 2009, a customer complained of loss of EPS in a 2005 Cobalt. GM investigated and found oil contamination or intrusion within the motor case in some Delta platform vehicles. In July 2009, the EPS supplier (JTEKT) identified the root cause in Delta vehicles as oil contamination or intrusion within the motor case and adopted sealed bearings as a corrective action for use going forward in 2010 model year Cobalts and HHRs, with no action taken for previously manufactured Cobalts and HHR.

10

28.     In June 2009, Old GM issued an updated version of its August 2007 Technical Service Bulletin to dealers (but again, not to consumers) regarding, "Diagnostic Tips for Power Steering Inoperative/Steering Wheel Hard to Turn, Power Steering Message Displayed on DIC, DTCs C0176, C0475, C0476, C0550, U2105, U2107 Set" (GM TSB # 07-02-32-007). The Service Bulletin was expanded to apply to additional model years and included the 2005-10 Chevrolet Cobalt, 2006-10 Chevrolet HHR, 2005-06 Pontiac Pursuit (Canada only), 2007-09 Pontiac G5, and 2003-07 Saturn Ion.  Still, no recall.

29.     On July 9, 2009, the United States Bankruptcy Court approved the sale of substantially all of Old GM's assets to New GM, which retained the vast majority of Old GM's senior and management level executives and engineers who knew that Old GM had manufactured and sold millions of vehicles afflicted with an EPS-based defect.  Those employees' knowledge regarding said defect is imputed to New GM, whenever obtained.

30.     On or around the day of its formation as an entity, New GM also acquired, inter alia, the knowledge of the contents of Old GM's "files" and company "documents."  To that end, New GM acquired notice of the safety-related defects contained in Old GM's files, including numerous engineering reports, investigative reports, failure analyses, technical service bulletins, and other documentation concerning the common defects in the EPS systems described herein.

31.     Defendant New GM also had ongoing obligations under the Safety Act to monitor both Old GM and New GM vehicles on the road, to make quarterly reports to NHTSA, and to maintain all relevant records for five years. Defendant New GM explicitly accepted Safety Act responsibilities for Old GM vehicles in § 6.15 of the Sale Agreement through which it acquired substantially all of Old GM's assets.

32.     The Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including incidents involving death or injury, claims relating to

property damage received by the manufacturer, warranty claims paid by the manufacturer, consumer complaints, and field reports prepared by the manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues. 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21. Manufacturers must retain for five years all underlying records on which the early warning reports are based and all records containing information on malfunctions that may be related to motor vehicle safety. 49 C.F.R. §§ 576.5 to 576.6.

33.     The Safety Act further requires immediate action when a manufacturer determines or should determine that a safety defect exists. United States v. General Motors Corp., 574 F. Supp. 1047, 1050 (D.D.C. 1983). A safety defect is defined by regulation to include any defect that creates an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident." 49 U.S.C. § 30102(a)(8). Within five days of learning about a safety defect, a manufacturer must notify NHTSA and provide a description of the vehicles potentially containing the defect, including "make, line, model year, [and] the inclusive dates (month and year) of manufacture," a description of how these vehicles differ from similar vehicles not included in the recall, and "a summary of all warranty claims, field or service reports, and other information" that formed the basis of the determination that the defect was safety related. 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)-(c). Then, "within a reasonable time" after deciding that a safety issue exists, the manufacturer must notify the owners of the defective vehicles. 49 C.F.R. §§ 577.5(a), 577.7(a). Violating these notification requirements can result in a maximum civil penalty of $15,000,000. 49 U.S.C. § 30165(a)(1).

34.     Defendant New GM used several processes to identify safety issues, including the Transportation Recall Enhancement, Accountability and Documentation ("TREAD") database and Problem Resolution Tracking System ("PRTS"). The TREAD database, used to store the data

required for the quarterly NHTSA early warning reports, was the principal database used by Old and New GM to track incidents related to Old and New GM vehicles. The database included information from (i) customer service requests; (ii) repair orders from dealers; (iii) internal and external surveys; (iv) field reports from employees who bought Old and New GM vehicles and from Captured Test Fleet reports; (v) complaints from the OnStar call center; and (vi) a database maintained by Old and New GM legal staff to track data concerning complaints filed in court. A TREAD reporting team would conduct monthly database searches and prepare scatter graphs to identify spikes in the number of accidents or complaints related to various Old and New GM vehicles. The PRTS is a database that tracks engineering problems identified in testing, manufacturing, through warranty data, and through customer feedback. The PRTS process involves five steps: identification of the issue; identification of the root cause; identification of a solution; implementation of the solution; and feedback.

35. Because the same employees carried out the TREAD Act obligations at Old GM and Defendant New GM, they not only retained the knowledge they acquired at Old GM—they were in fact required to do so. This further supports the propriety of imputing the knowledge of Old GM employees to New GM, even where that knowledge stems in part from their performance of the same or similar roles at Old GM.

36. The knowledge and conduct of Old GM is generally important and relevant because it is imputed to Defendant New GM under governing principles of agency law.

37. Numerous Old GM employees carried knowledge of the EPS defect with them into their continued employment at New GM after the July 10, 2009 Bankruptcy Sale, including Victor Bardas (the GM Design Release Engineer for the EPS system at issue); Christopher Janik (GM products investigation engineer who was assigned to lead the investigation into EPS field incidents in January 2009); and Yat-Chung "Sunny" Tang (GM Technical Lead Engineer who met with EPS

supplier JTEKT in 2009-2010 regarding customer complaints of sudden EPS loss).

38.     In January 2010, NHTSA opened a Preliminary Investigation to assess the frequency, scope, and safety consequences of alleged sudden loss of EPS in 2005-2009 Cobalts, reporting 1,132 complaints, 11 crashes/fires, and one injury incident potentially related to the issue. NHTSA followed with an information request for the Cobalt and "similarly equipped peer vehicles" in February 2010.

39.     In responding to NHTSA's February 2010 request for information regarding the Cobalt and "similarly equipped peer vehicles," GM reported 1,668 complaints of loss of power assist in 2005-2009 Cobalts, and 2,759 similar complaints in the ION, Malibu, and G6. The corresponding numbers for warranty claims were 2,884 for the Cobalt and 5,313 for the peer vehicles. While New GM recalled some of the affected Delta-platform vehicles in March 2010, it did not recall other Delta-platform vehicles (the HHR and ION) that utilized a substantially similar steering column, motor, and control module as the Cobalt, even though Transport Canada, in issuing an information request to GM Canada regarding HHR and ION vehicles, did not "perceive a tangible or physical difference between the HHR/ION vehicles and the Cobalt/Pursuit/G6 vehicles regarding the electric power steering issue." Instead, New GM issued warranty extensions in July 2010 and instructed dealers to perform the same remedy called for by the 2010 Cobalt recall – replacement of the power steering motor – if the customer had experienced a sudden loss of power steering assist. Additional warranty extensions were issued by GM in 2012.

40.     When New GM recalled MY 2005-2010 Chevy Cobalts and MY 2007-2010 Pontiac G5s for power steering issues in March 2010, the '573 Letter explained as follows:

> General Motors has decided that a defect, which relates to motor vehicle safety, exists in certain 2005-2010 model year Chevrolet Cobalt and 2007-2010 model year Pontiac G5 vehicles. Certain vehicles equipped with electric power steering may experience a

> sudden loss of power steering assist that could occur at any time while driving. If the power steering assist is lost, a message is displayed on the Driver Information Center and a chime sounds to inform the driver. Steering control can be maintained, as the vehicle will revert to a manual steering mode, but would require greater driver effort at low vehicle speeds.

The remedy: "Dealers are to replace the electric power-steering motor."

41. Admittedly, New GM only issued this half-hearted recall "based on GM's desire to obtain quick resolution and closure of the government investigation," and GM spokesperson Alan Adler stated that GM had initially been planning to categorize the EPS issue as a customer satisfaction issue, "but as a result of the congressional scrutiny of Toyota and the unintended acceleration issues, it was agreed that GM should issue a safety recall before the hearings so that 'we would not get mentioned or dragged in to the Senate.'"

42. In December 2010, GM Canada issued a recall for EPS defects in the 2003-07 ION and the 2006-10 HHR models equipped with the same EPS motor as the 2005-2010 Cobalts and G5s recalled earlier. The recall provided "special coverage" for 10 years or 240,000 kilometers, whichever occurred first, and advised owners that they could obtain the EPS motor replacement whether or not their vehicle had experienced a loss of power steering. Unlike with the Special Coverage campaigns in the U.S., GM of Canada advised owners that "a defect, which may relate to motor vehicle safety, may exist. . ." But GM did not issue a recall in the United States, even though the Canadian and U.S. ION and HHR models were the same. Further, GM's Dynamic Steer Effort tests comparing steering effort in the Ion to the Cobalt found that the steering effort in both vehicles was "very close."

43. Also in December 2010, NHTSA issued a notice of recall query (RQl0-004) regarding EPS system failure in MY 2004-07 IONs. NHTSA noted that the Special Coverage afforded by GM under the EPS failure described in Service Bulletin 10187 was "substantially the

same as that investigated by ODI [Office of Defect Investigation] during PE10-005 for sudden failure of the EPS assist in MY 2005 through 2010 Chevrolet Cobalt vehicles which have a substantially similar EPS system and assist electric motor and were recalled for this condition in March 2010."

44.    GM responded to NHTSA's information requests through a series of letters in April through June 2011. In its May 20, 2011 submission, New GM represented that, "GM does not believe that this condition poses an unreasonable risk to motor vehicle safety," a stark contrast to the more recent representations of GM CEO Mary Barra.[1]  Notably, days before this submission, GM attorneys were scrambling to come up with a believable explanation as to why the recall was expanded to Ions and HHRs *in Canada* but not in the U.S.[2]

45.    Around this same time, New GM brought an arbitration action against EPS steering column assembly supplier JTEKT, alleging breach of express and implied warranties for selling New GM "EPS Columns contain[ing] defective steering assemblies or parts"[3] in the GMX001 (Cobalt) and the GMT001 (HHR). New GM explained the following in its pleadings: "Soon after the vehicles were first sold to the public, GM began to receive an unexpectedly high number of warranty claims from customers relating to the steering columns in their vehicles." New GM further lamented about having to spend more than $30 million on warranty claims relating to an "excessive noise" problem in the steering columns, but then the initial steering column problems

---

[1] *See, e.g.*, 10/19/15 M. Barra Dep. at 305:3-305:8; 317:01-318:03 (stating that loss of power-steering alone constitutes a safety defect).

[2] *See* GM-MDL2543-002629787.001, May 13, 2011 email chain between Old-to-New GM executive attorneys Lawrence Buonomo, Michael Millikin, Lucy Clark-Dougherty, Deborah Nowak-Vanderhoef, and William Kemp, in which then-head of the GM Settlement Review Committee ("SRC") Lawrence Buonomo writes, "[Former GM General Counsel] Mike Millikin called with [GMNA General Counsel] Lucy [Clark-Dougherty], and confirmed that if possible he would like to get an extension on the [NHTSA] IR responses to work through issues around risk to safety and the contrast with the Cobalt and Canada."

[3] *In the Matter of the Arbitration between General Motors LLC, et al. v. JTEKT North America, Inc., et al.*, JAMS No. 1340008382, Mar. 16, 2011, GM-MDL2543-004556100, at -6101.

were dwarfed by those that followed thereafter:

> "After spending tens of millions of dollars on warranty claims for
> JTEKT's defective EPS Columns caused by the excessive noise
> problem, GM discovered yet another — and much more serious —
> defect in the EPS Columns. Specifically, many owners of GM
> vehicles equipped with the EPS Columns reported experiencing a
> sudden and unexpected loss of all power steering in their vehicles.
> The loss of power steering was often intermittent, unpredictable, and
> could occur at any time while the vehicle was being driven."

New GM further noted that, although it worked with JTEKT in the Fall and Winter of 2009 to

develop a modification to the motor assembly in the EPS Column to prevent the loss-of-EPS

condition from occurring, "by that time more than a million GM vehicles had already been sold

with the defective JTEKT parts."

46.    In September 2011, NHTSA upgraded its inquiry to an engineering analysis and

reported that New GM acknowledged that it had received almost 3,500 customer reports claiming

a sudden loss of power steering in 2004-2007 ION vehicles. NHTSA recorded over 17,385

complaints and warranty claims potentially related to loss of power steering assist in the 2004-07

ION, including 16 crashes and two injuries. The following month, GM engineer Terry

Woychowski informed current CEO Mary Barra – then head of product development at GM – that

there was a serious power-steering issue in Saturn IONs, and that it may be the same power steering

issue that plagued the Chevy Cobalt and Pontiac G5. Ms. Barra was also informed of the ongoing

NHTSA investigation, and GM General Counsel at the time Michael Millikin arranged a meeting

with top executives and members of the GM legal department to discuss. As evidenced by the lack

of recall until April 2014, no recommendations for expanding the initial recall came out of that

meeting.

47.    By March 2012, New GM had received more than **_18,000_** customer complaints of

loss of electric power steering in the 2004-07 Ion, 2004-06 Malibu, 2004-06 G6, 2006-10 HHR,

and 2005-09 Cobalt, complaints that were consistent with the oil/sulfur contamination condition in the EPS motor that causes the driver to suddenly lose power-steering, as described in New GM's April 14, 2014 Part 573 Letter to NHTSA regarding Recall No. 14V-153. For example, in early 2012, NHTSA directly delivered hundreds of Vehicle Owner Questionnaires ("VOQs") to New GM regarding loss of EPS in IONs and HHRs, showing that customers were repeatedly iterating variations of the same complaint – a complaint with which New GM was very familiar by this point:

- 3/23/11[4], 2007 Chevrolet HHR customer: "While driving at 65 miles per hour on the interstate, the power steering light beeps three times and my power steering fails causing me to almost have an accident – when the car is turned off and turned back on, the steering resets itself but only temporarily – I took it to the dealer and it's a power steering motor and is not covered under my warranty – when I started researching, I found that multiple instances of this occur – I called Chevrolet and they said that several cars with this problem and this same power steering motor have been recalled but not the HHR but I should check back later – it is impossible to drive and very dangerous."

- 5/30/11, 2008 Chevrolet HHR customer: "The electric power steering turned itself off mid turn causing a drastic understeering leading the vehicle into oncoming traffic. Upon research I found that GM recalled the exact same steering components that failed in the HHR in other GM vehicles but not the HHR. If this does not warrant serious investigation what does. The second time this happened everything was fine as we were driving straight. The problem occurred when the electric power steering turned back on mid-turn causing my wife to over turn into someone's front lawn, had anyone been in the way this would have been tragic. . . . Why hasn't there been a recall issued, this is a severe [sic] driving impairment that can cause accidents and GM doesn't seem to care. . . . Why is it GM Canada issued a recall on this part for the HHR and not the US branch?"

- 6/1/11, 2003 Saturn Ion customer: "I was traveling approximately 40 MPH when the power steering lamp came on and the power steering failed. After pulling to the side of the road, and turning the vehicle off, I restarted the vehicle and the power steering was restored for about 20 minutes. The days following this, I encountered several power steering failures until I had the power steering box replaced on May 10, 2011. . . . I strongly feel that a recall should be in place for the power steering failure, and all who had the problem corrected out of pocket, should be reimbursed at GM's expense. . . . I would not like to have human life lost before this problem is given serious consideration!"

---

[4] This date and the dates of the complaints listed hereafter refer to the date upon which New GM received the subject complaint.

- 6/19/11, 2006 Chevrolet HHR customer: "I was driving and just when I was on a curved street my car let me know that there was a problem with the power steering. I needed to act fast to avoid an accident due to the fact that I was on a curved street. . . . The car [is] still doing the same every day, but the main problem is that it happens randomly, so you can['] t predict when you will start having a power steering problem.  Once you turn off [sic] the car and turn it on again system works well for a while. Again, you will never know when it will start having the problem. . . . I'm not sure if there is any replacement for this part in which I can be confident that it will never happen again."

- 6/25/11, 2009 Chevrolet HHR customer: "The HHRs are having the same power steering assist problem that exists in the Cobalt. The Cobalt is covered by a recall, but the HHR is not.  I believe the HHR should have the same recall because it has the exact same component that is failing.  The power steering goes out suddenly and has caused my wife to lose control of the car."

- 6/27/11, 2005 Saturn Ion customer: "While driving 60 MPH the power[-]steering light comes on and the power steering malfunctions. The vehicle becomes very difficult to drive when the power steering goes out. Have to shut the vehicle off and restart it for the power steering system to work properly.  Called the dealer regarding the power steering and the dealer stated there are no open recalls on the vehicle at this time. . . . This has happened on the interstate twice an[d] on regular roadways twice in last month."

- 6/30/11, 2006 Saturn Ion customer: "Power steering indicator would come on and steering ability will disappear. . . . Car taken to dealership to be serviced under special warranty.  This part should definitely be recalled."

- 7/2/11, 2007 Saturn Ion customer: "While negotiating a left turn the power steering went out almost causing my wife to hit the oncoming car."

- 7/5/11, 2004 Saturn Ion customer: "Electronic assist power steering fails without any warning. Steering becomes very difficult if not impossibly for some people which could lead to loss of control."

- 7/18/11, 2009 Chevrolet HHR customer: "During the ice storm the power steering went out in my vehicle. My husband was driving and that is the only reason we didn't have an accident. This continues to be a problem on my 2009 Chevy HHR LT."

- 8/10/11, 2010 Chevrolet HHR customer: "When driving the power steering stops functioning and the steering becomes difficult to turn. When the car is turned off and restarted the power steering is operative for a short time and then fails again."

- 10/24/11, 2009 Chevrolet HHR customer: "2009 Chevy HHR LT which is having the same problems that caused a recall on the Chevy Cobalt . . . . My power steering system fails in the middle of a turn, the LED read out says power steering and then it completely goes out, I have to either turn the vehicle off and re[-]start it or remove the fuse that is in the electrical fuse box and put it back in, this only corrects the problem temporarily, (this is so dangerous, as I might be in the middle to a curve on wet/icy roads and having the steering go out on me) There are numerous threads on line in reference to this issue with the HHR and GM has not done a recall for it in this model, this vehicle has the

same steering components as the ones that have been recalled. . . . I have grand children that are in my car at any given time and I should not have to worry about. . . the steering going out while I am in a turn on a wet or icy road!"

48.     In April 2012, New GM met with NHTSA regarding NHTSA Query RQ10-004/EA11-014, which concerned loss of power steering assist in 2004-07 Saturn Ions, and specifically why the Ions only received extended warranty coverage when the 2005-09 Cobalt was fully recalled for the same failure mechanism in March 2010.

49.     In September 2012, GM Canada issued a notice of defect for certain Malibu, Malibu Maxx, G6, and Aura vehicles, although it would take almost two more years for New GM to recall those vehicles in the United States.

50.     Indeed, by the middle of 2013, both Old GM and New GM had received *thousands* of complaints involving drivers of Delta and Epsilon platform vehicles experiencing sudden loss of EPS, describing the very same manifestation of the defect.  For example:

- 2004 Chevrolet Malibu Classic customer complaint, received by Old GM at least as early as February 7, 2007: "2004 MALIBU CLASSIC WITH POWER STEERING PROBLEMS. . . THE CONSUMER WAS INVOLVED IN AN ACCIDENT WHERE THE POWER STEERING WENT COMPLETELY OUT."

- 2005 Chevrolet Cobalt customer complaint, received by Old GM at least as early as April 2008: "WITH LITTLE WARNING, POWER STEERING WENT OUT AS I WAS LEAVING MY DRIVEWAY;  I BARELY COULD TURN THE STEERING WHEEL; WHEN THE ENGINE WAS SHUT OFF, I WAS ABLE TO DRIVE SHORT DISTANCE AND THEN THE POWER STEERING LIGHT CAME ON.  FORTUNATELY, THE CAR WAS STILL UNDER WARRANTY; MY STEERING COLUMN HAD TO BE REPLACED.  NOW I CONTINUE TO HAVE PROBLEMS WITH THE FRONT END, WITH THE ENGINE LIGHT COMING ON!!!!  I THOUGHT CHEVY COBALT HAD GOOD CONSUMER REPORTS.  WHAT HAPPENED CHEVROLET???  DID YOU ALL DECIDE THAT QUALITY JUST ISN'T WORTH A DAMN! HOW ABOUT PUBLIC SAFETY!!!  I AM AN RN AND AM OUTRAGED AT THE NUMBER OF COMPLAINTS REGARDING THIS SAME ISSUE, AND YET NO PUBLIC RECALL HAS BEEN ANNOUNCED. DOES SOMEONE HAVE TO DIE FIRST?"

- 2005 Chevrolet Cobalt customer complaint, received by Old GM at least as early as October 11, 2008: "POWER STEERING PROBLEM WITH MY 2005 CHEVY COBALT. THREE ATTEMPTS BY GM DEALER TO FIX A PROBLEM, THE

PROBLEM IS STILL THERE. THIS SHOULD LEAD TO SAFETY RECALL. DURING THE DRIVING POWER STEERING WARNING LIGHT COMES ON, THE CAR STARTS TO SHAKE AND IS NOT SAFE TO DRIVE. I FILLED COMPLAINT WITH BBB, CHEVY, BUT THEY SAID THAT THE SAFETY RECALL MUST COME FROM NHTSA. LOOKS LIKE THOUSANDS OF POWER STEERING COLUMNS HAVE BEEN REPLACED ON TWO OR THREE YR OLD CARD, WHICH IS UNACCEPTABLE. THIS IS NOT NORMAL WEAR-AN-TEAR PART, AND SOMEONE SHOULD RUN STATISTICS ON THIS PART WITH GM, AND CONSIDER THE SAFETY OF CUSTOMERS/DRIVERS. THIS IS A TYPICAL HIGHSCHOOL/COLLEGE STUDENTS CAR, INEXPERIENCED DRIVERS IN TOTALLY UNSAFE CARS... DO NOT WAIT UNTIL SOMEONE GETS KILLED TO HAVE RECALL ON CHEVY COBALTS POWER STEERING ISSUES."

- 2006 Pontiac G6 customer complaint, received by Old GM at least as early as December 4, 2008: "I AM WRITING TO NOTIFY YOU OF SERIOUS SAFETY CONCERNS REGARDING MY 2006 PONTIAC G6 GT. I PURCHASED MY CAR FROM LOU SOHB PONTIAC GMC IN CONYERS, GA ON NOVEMBER 6, 2006. APPROXIMATELY 6 MONTHS LATER, I BEGAN HAVING TROUBLE WITH THE POWER STEERING. THERE WERE INSTANCES WHILE TRAVELING ON THE ROAD THAT THE CAR WOULD MOMENTARILY LOSE THE POWER STEERING CAPABILITY AND THEREIN MAKES THE VEHICLE DIFFICULT TO TURN.  I WAS INVOLVED IN AN ACCIDENT ON JUNE 28, 2007. WHILE ATTEMPTING TO MAKE A LANE CHANGE THE VEHICLE'S STEERING WHEEL BECAME VERY DIFFICULT TO TURN AND [LOST] POWER STEERING AND IT RESULTED IN ME BEING STRUCK ON THE PASSENGER SIDE BY ANOTHER VEHICLE. THERE WERE NO INJURIES. THE VEHICLE WAS REPAIRED AND IT SEEMED AS I SIMPLY VIEWED IT AS ONE OF THOSE UNEXPLAINABLE INSTANCES.   ON DECEMBER 25, 2007, CHRISTMAS DAY THE VEHICLE AGAIN HAD A MOMENTARY LOSS OF POWER STEERING AS I WAS TURNING IN MY DRIVEWAY. I TOOK THE VEHICLE TO THE DEALER THE FOLLOWING WEEK AND I WAS TOLD THAT THERE WERE NO PROBLEMS AND THE STAFF LOOKED AT ME AS IF I WERE CRAZY TRYING TO EXPLAIN THAT IT JUST HAPPENS UNEXPLAINABLE AND THEN WORKS FINE AGAIN. THE STAFF AT THE DEALERSHIP DID NOT LEAVE ME ASSURED THAT IT WOULD NOT HAPPEN AGAIN. . . . AT THIS POINT, THE POWER STEERING HAS BEEN CHECKED BY BOTH GM CERTIFIED MECHANICS AND A PRIVATE MECHANIC AT COST TO ME. BOTH TIMES I WAS TOLD THAT THEY COULD NOT SEE ANYTHING WRONG THAT WOULD MAKE IT MALFUNCTION AS SUCH. I HAVE NOW GROWN FEARFUL TO DRIVE THIS VEHICLE, AS I HAD A MOMENTARY LOSS OF POWER STEERING AGAIN THIS PAST WEEKEND ON NOVEMBER 22, 2008 WHILE EXITING THE FREEWAY HEADING 75 NORTH IN ATLANTA. THIS HAS BECOME A REAL SAFETY ISSUE."

- Jun. 29, 2009, Saturn Dealership Work Invoice for 2004 Saturn ION customer: "CUST STATES THE POWER STEERING WILL STOP WORKING.  TECH VERIFIED CONCERN, INSPECTED AND FOUND CODE C0475. REFERRED TO TSB 07-02-

32-007A."

- 2008 Saturn Aura customer complaint, received by New GM at least as early as February 2010: "2008 SATURN AURA 4 CY HAS POWER STEERING PROBLEMS. LIGHT COMES ON AND OFF AND THEN THE STEERING LOCKED UP WHILE I WAS DRIVING AT ABOUIT 45 MPH. TURNED OFF ENGINE AND RESTARTED AND STEERING WAS BACK. HAVING THIS PROBLEM FOR ABOUT 6 MONTHS. SATURN SAID NEEDS NEW MOTOR FOR ABOUT $300. RIDICULOUS!!"

- 2006 Chevrolet Cobalt customer complaint, received by New GM at least as early as June 4, 2010: "2006 CHEVROLET COBALT LOSES VARIABLE ASSIST POWER STEERING RANDOMLY. REQUIRES GREAT EFFORT TO TURN WHEN SYSTEM FAILS. THIS PROBLEM WAS NOT A ONE-TIME EVENT - IT OCCURED SEVERAL TIMES BEFORE I COULD ARRANGE REPAIRS. THE ENTIRE STEERING COLUMN AND ALL POWER ASSIST ASSOCIATED PARTS WERE REPLACED, AS THE DEALER STATED THIS WOULD BE THE CORRECTIVE ACTION. OLD PARTS WERE NOT RETAINED, AS I HAD THE VEHICLE REPAIRED BY A REPUTABLE, ASE CERTIFIED SHOP. THIS CAR IS USED BY MY 17 YEAR OLD DAUGHTER AS A COMMUTER CAR, SCHOOL AND SUCH. THIS PROBLEM WAS REPAIRED AT MY EXPENSE. NOW, GM HAS ISSUED A RECALL, BUT THE VERY DEALER THAT DIAGNOSED THE PROBELM IS TELLING ME THAT THIS COBALT IS NOT IN GM'S RECALL DATABASE. SURE ENOUGH, I WENT ONLINE AND CHECKED AND IT ISN'T IN THERE. THIS APPEARS TO BE JUST ONE MORE ATTEMPT BY GM TO DODGE THEIR ETHICAL RESPONSIBILITY TO CORRECT SERIOUS DEFECTS IN THEIR VEHICLES OR TO REIMBURSE OWNERS THAT HAVE REPAIRED A DEFECT THAT LATER BECOMES A RECALL ISSUE."

- 2007 Saturn ION owner letter to Mark Reuss and other General Motors executives, received by New GM on July 19, 2010: "[I]n December of 09, while initiating a turn, the power steering light comes on and the steering wheel completely locks up almost costing me my life! I immediately pulled up sources on the internet noting the same problem with Saturn owners with my same year and model and even some older and newer with the same problem. To make matters wors[e], GM recalled. . . over 1.3 million cars in March of this year for the exact same failure with the Power Steering, however, Saturns weren't included. . . . In essence, these cars should have been recalled a long time ago due to persistent weird and dangerous problems that just occur at any time. . ."

- 2007 Chevrolet Cobalt customer complaint, received by New GM at least as early as June 10, 2010: "I HAVE A 07 COBALT LS AND 2007 COBALT SS[.] THE FIRST ONE I WRECKED ONE NIGHT GOING AROUND A TURN AT ABOUT 30 WHEN ALL THE SUDDEN THE POWER STEERING WENT OUT AND I COULDNT STOP IN TIME I POPPED THE CURB WENT THROUGH A FIRE HYDRANT [sic] AND SMASHED INTO A FENCE TOTALING MY CAR WITH WELL OVER 8500 [DOLLARS] IN REPAIRS[.] THE SECOND ONES POWER STEERING JUST WENT OUT ON ME ON THE WAY HOME WITH MY PREGNANT GIRLFREIND IN THE CAR LUCKLY WE WERE TURNING ON OUR STREET SO THERE WAS

NO ACCIDENT INVOLVED. BOTH CARS JUST HIT 40,000 MILES AND RAN PERFECTLY INTELL THE POWER STEERING WENT OUT LEAVING ME WITH NO RIDE."

- Aug. 17, 2010, Customer letter to General Motors from Joseph M. Destralo, III, regarding his son's 2006 Chevrolet Cobalt: "My son was driving home from college (York, Pennsylvania) for Spring Break and the power steering message came on — the car was difficult to steer. We brought his car to the dealer in Turnersville for service. It took 3 days before the part could be shipped. . . . He was not offered a rental car until after the 3rd day and by then the part was in and the car was being fixed. (It was at the dealer from 3/1/10 to 3/5/10) I paid $107.00 for this repair — it was covered under the GM Extended Warranty Contract. We later found out that this problem was related to a General Motors recall. To date, we have yet to receive any notice."

- 2007 Pontiac G6 customer complaint, received by New GM on January 19, 2011: "THE CONTACT OWNS A 2007 PONTIAC G6. WHILE DRIVING APPROXIMATELY 5 MPH LEAVING A PARKING AREA THE VEHICLE STEERING LOCKED UP. SHE STATED THE POWERING STEERING LIGHT ILLUMINATED ON THE DASHBOARD. SHE PULLED OVER TO THE SIDE OF THE PARKING LOT AND CALLED A FAMILY MEMBER. THE VEHICLE WAS VERY DIFFICULT TO STEER BUT SHE DROVE THE VEHICLE HOME. SHE LATER CALLED THE DEALER AND EXPLAINED THE FAILURE AND WAS ADVISED THAT THEY WOULD PICK THE VEHICLE UP. THE VEHICLE HAD NOT BEEN REPAIRED."

- 2008 Pontiac G6 customer complaint, received by New GM on August 15, 2011: "FAILURE WITH POWER STEERING IN 2008 PONTIAC G6 CAUSED ME TO GET INTO A CAR ACCIDENT. THE STEERING WHEEL WOULDN'T MOVE, IT HAD LOCKED UP. CAUSED ME TO LOSE CONTROL OF THE CAR DOING 360'S ON THE HIGHWAY, HITTING THE CONCRETE MEDIAN ABOUT 4 TIMES GOING 55MPH. FRONT, BACK, BOTH SIDE PANELS AND ENTIRE RIGHT SIDE OF CAR WERE SEVERELY DAMAGED. I HAD SEVERE WHIPLASH AS WELL AS SLIPPED DISKS IN MY NECK. HAD ABOUT $6,000 WORTH OF REPAIRS BUT INSURANCE COVERED IT. HOWEVER INSURANCE DID NOT COVER THE COSTS OR REPLACE THE POWER STEERING COLUMN. THEY CLAIMED IT WAS NOT AN ISSUE, HOWEVER MY LIGHT HAD BEEN GOING ON FOR ABOUT A MONTH PRIOR. I CANNOT AFFORD IT SO THEREFORE HAVE NOT GOTTEN IT FIXED. THE POWER STEERING ISSUE BEGAN IN MAY OF 2011. THE FACTORY WARRANTY HAD EXPIRED IN MARCH."

- 2006 Pontiac G6 customer complaint, received by New GM on September 26, 2011: "I WAS PULLING OUT FROM A GAS STATION WHEN THE POWER STEERING LIGHT WENT OFF AND WITHIN 2 SECONDS ALL POWER STEERING WAS GONE. AFRAID TO DRIVE ANY FURTHER I PARKED MY CAR AND DID WHAT I NEEDED TO DO. WHENEVER I RETURNED TO TRY AND DRIVE MY CAR BACK HOME (IT SAT THERE FOR 1 1/2 HRS) THERE WAS NO PROBLEM STEERING IT. I HAVE TEEN AGE SONS WHOM DRIVE MY CAR FROM TIME TO TIME AND IF THIS HAPPENS TO THEM WHILE DRIVING THERE'S NO TELLING WHAT COULD HAPPEN. I'VE CALLED GM AND THERE'S NO

RECALL ON THIS PROBLEM SO IF I WANT IT FIXED IT'S CONSIDERED MY PROBLEM NOW. I WILL NEVER PURCHASE ANOTHER GM CAR OR SUV EVER AGAIN AND WILL ALSO WARN MY FRIENDS."

- 2006 Pontiac G6 customer complaint, received by New GM on November 16, 2011: "THE POWER STEERING IS FAILING AT LOW SPEEDS WHILE TURNING CORNERS. THERE IS A LOUD THUMP THAT COMES FROM SOMEWHERE AROUND THE STEERING COLUMN OR JUST UNDER THE DASH ON THE DRIVER'S SIDE, THE POWER STEERING FAILS, AND THE DRIVER INFORMATION SYSTEM INDICATION LIGHTS AND POWER STEERING FAILURE MESSAGE APPEAR. THIS ALWAYS HAPPENS WHEN THE CAR IS MAKING A TURN SO IT BECOMES NEARLY IMPOSSIBLE TO FINISH MAKING THE TURN BECAUSE IT IS SO DIFFICULT TO TURN THE STEERING WHEEL. . . . THE PROBLEM FIRST STARTED OCCURRING EARLY IN 2011 AND OCCURRED APPROXIMATELY 4 TIMES DURING THE SPRING AND SUMMER. . . . NEAR THE END OF OCTOBER 2011, THE PROBLEM BEGAN HAPPENING ALMOST CONTINUALLY. . . . I BEGAN LOOKING INTO THE PROBLEM AND FOUND THAT THIS IS A KNOWN ISSUE TO GM. AFTER CONTACTING THE LOCAL CHEVY DEALERSHIP AND GM, I FOUND OUT THAT GM WAS OFFERING 'SPECIAL COVERAGE' FOR THIS ISSUE BUT UNFORTUNATELY MY CAR WAS 'OUTSIDE THE PARAMETERS OF THE SPECIAL COVERAGE' BECAUSE THE COVERAGE ONLY COVERED 10 YEARS OR 100,000 MILES. MY CAR WAS AT 122,000 MILES. I QUESTIONED WHY A MAJOR SYSTEM OF THE CAR WAS ONLY COVERED TO 100,000 MILES AND THEY IMPLIED THAT I HAD DRIVEN MY CAR IN SUCH A WAY THAT I HAD CAUSED THIS PROBLEM. THEY FINALLY AGREED THAT MY ISSUE 'SOUNDED SIMILAR TO OTHER INCIDENTS THAT HAD BEEN REPORTED' AND ASKED ME TO TAKE IT TO THE DEALER FOR A DIAGNOSTIC TEST. THEY INSISTED THAT THERE WAS NO RECALL ON MY CAR FOR THIS ISSUE, BUT FINALLY AGREED TO COVER THE COST OF THE REPAIR AS AN EXCEPTION TO THE SPECIAL COVERAGE THEY HAD OFFERED OTHER DRIVERS. I HAD TO FIGHT GM ALL THE WAY ON THIS EVEN THOUGH IT WAS A SERIOUS SAFETY ISSUE."

- 2005 Chevrolet Malibu customer complaint, received by New GM on November 28, 2011: "DING SOUND AND THEN POWER STEERING LIGHT CAME ON. TOOK TO DEALERSHIP AND WAS TOLD POWER STEERING SENSOR WAS THE CAUSE OF THE PROBLEM. I HAVE READ WHERE THERE HAVE BEEN SEVERAL [sic] COMPLAINTS ON PROBLEMS WITH THE POWER STEERING WITH THIS VEHICLE. I HAVE CONTACTED GM AND THEY PROCLAIM THEY ARE NOT AWARE OF ANY PROBLEMS YET THERE IS A LETTER THAT WAS SENT OUT IN 2007 EXTENDING THE WARRANTY ON THE VEHICLE. I PURCHASED THE VEHICLE IN 2009. I AM TOLD THE STEERING COLUMN MAY NEED TO BE REPLACED."

- 2004 Chevrolet Malibu customer complaint, received by New GM at least as early as February 24, 2012: "LOSS OF POWER STEERING AT VARIOUS SPEEDS... STEERING COMES & GOES, LOSS OF POWER ASSIST. SHOULD BE A

RECALL-VERY DANGEROUS WHEN NOT EXPECTED."

- 2005 Chevrolet Malibu Maxx customer complaint, received by New GM at least as early as February 24, 2012: "MY 2005 MALIBU MAXX LS LOSES ITS POWER STEERING. IT DOES NOT MATTER WHAT THE TEMPERATURE, OR WHAT THE WEATHER IS LIKE, JUST OUT OF THE BLUE THE BELL GOES OFF AND POWER STEERING [SIC] RUNS ACROSS THE DASH. IT WILL RESET [ITSELF] ONCE THE VEHICLE HAS BEEN SHUTOFF AND RESTARTED. IT HAS HAPPENED ON SEVERAL OCCASIONS, HOWEVER, IT HAS BECOME MORE FREQUENT. THIS ISNT VERY SAFE!!"

- 2006 Chevrolet Cobalt customer complaint, received by New GM at least as early as May 20, 2012: "MY WIFE AND GRANDSON WERE IN THE CAR WHEN POWER STEERING CAME ON THE DASH. IT CAUGHT HER ATTENTION BUT DIDN'T KNOW REALLY WHAT HAD HAPPEND TILL SHE TRIED TO TURN AND ALMOST WENT IN THE DITCH. WE TOOK IT TO THE DEALER AND 700.00 PAID TO HAVE THE PROBLEM CONTINUE TO REOCCURE. IT COMES AND GOES AND IF IT IS NOT A PROBLEM WHEN WE TAKE IT TO THE DEALER THEY DON'T KNOW WHAT TO DO. ALL THEY SAY IS IT IS IN THE WIREING ISSUE AND THINK WE SHOULD BUY SOMETHING ELSE. I DIDN'T KNOW ABOUT ALL THESE PROBLEMS TILL IT OCCURED TO US. WE BOUGHT THE CAR NEW AND HAVE LIKE THE 2006 COBALT BUT THIS IS THE FIRST I HAVE HEARD THEY HAVE A PROBLEM WITH THE POWERSTEERING OR WIREING TO THE ELECTRIC ASSIST TO THE POWER STEERING. I AM TOLD THEY HAD A FIX BACK IN 2010 ARE WE STILL QUALIFIED TO HAVE OUR CAR FIXED UNDER THAT RECALL. MY SON IS GOING IN THE ARMY IN A COUPLE WEEKS WE WANTED TO LET HIM HAVE THIS CAR AFTER HE GETS STATIONED SOMEWHERE BUT WE CANN'T GIVE IT TO HIM WHEN WE ARE NOT TRUSTING ITS SAFETY."

- 2006 Pontiac G6 customer complaint, received by New GM on June 6, 2012: "OUR 2006 PONTIAC G6, PURCHASED USED FOR MY SON TO DRIVE TO/FROM SCHOOL, RECENTLY BEGAN TO LOSE POWER STEERING ASSIST WHILE HE WAS DRIVING. AFTER SEARCHING THE INTERNET FOR THIS EXACT ISSUE, I SEE THAT THIS FLAW IS QUITE WIDESPREAD AND WELL-KNOWN TO GM AND G6 OWNERS. THE NHTSA CAMPAIGN ID # PE07023 DOWNPLAYED THE ISSUE IN DETERMINING THAT A SAFETY-RELATED DEFECT DOES NOT EXIST. I MAINTAIN THAT WHEN A G6 DRIVER EXPECTS POWER STEERING DURING OPERATION OF THE VEHICLE AND IT FAILS TO PERFORM AT THE MOMENT IT IS EXPECTED, I CERTAINLY WOULD CONSIDER THAT A SAFETY ISSUE. YES IT IS STILL STEERABLE, BUT NOT IN THE SAME MANNER. THE CAR IS OUTSIDE OF ANY GM MAINTENANCE/WARRANTY AT THIS POINT DUE TO ITS MILEAGE, SO I EXPECT THIS WILL BE OUT-OF-POCKET TO REPAIR. THIS IS WHY I WON'T BUY ANOTHER UNSAFE GOVERNMENT MOTORS CAR IN THE FUTURE. MY TAX DOLLARS SUPPORTED A COMPANY THAT CAN'T PRODUCE FUNCTIONAL POWER STEERING. I NEVER HAD THIS PROBLEM FROM ANY OTHER MAKE OF AUTOMOBILE. AMAZING BUREAUCRACY."

- 2005 Pontiac G6 customer complaint, received by New GM on July 30, 2012: "POWER STEERING FAILED, WITHOUT WARNING, LIGHT COMING ON. TURNING WHEELS IS ALMOST IMPOSSIBLE, THIS IS EXTREMELY DANGEROUS."

- 2007 Chevrolet Malibu customer complaint, received by New GM at least as early as December 27, 2012: "MY SON WAS DRIVING THE 2007 CHEVY MALIBU I BOUGHT FOR HIM FOR WORK/SCHOOL WHEN THE ELECTRICAL POWER STEERING SYSTEM WENT OUT. HE WAS DRIVING DOWN A BUSY THREE LANE ROAD, AND AS HE BEGAN TO CHANGE LANES, THE STEERING BECAME VERY STIFF. HE HEARD A CHIME AND THEN SAW THE DASH FLASH 'POWER STEERING.' SINCE HE WASN'T EXPECTING THIS, HE COULDN'T CONTROL THE STEERING RIGHT AWAY, AND THE MALIBU CONTINUED TO DRIFT TOWARD THE OUTER LANE IN WHICH ANOTHER VEHICLE WAS IN. HE BARELY AVOIDED HITTING THE SIDE OF THIS OTHER VEHICLE BY TURNING THE STEERING WHEEL OF THE MALIBU THE OTHER WAY BY USING A LOT OF FORCE. SINCE THEN, THE POWER STEERING GOES OUT INTERMITTENTLY. THIS IS VERY UNSAFE AND NEEDS TO BE REPAIRED AS SOON AS POSSIBLE, BEFORE SOMEONE IS INJURED OR KILLED, AND IT SHOULD BE REPAIRED BY THE MANUFACTURER, SINCE THIS SEEMS TO BE A GENERAL PROBLEM WITH THE 2007 CHEVY MALIBU."

- 2008 Chevrolet Malibu customer complaint, received by New GM at least as early as February 11, 2013: "THE CONTACT OWNS A 2008 CHEVROLET MALIBU. THE CONTACT STATED THAT WHILE DRIVING APPROXIMATELY 65 MPH, THE POWER STEERING WARNING LIGHT ILLUMINATED AS THE STEERING WHEEL BECAME DIFFICULT TO MANEUVER. THE VEHICLE WAS TAKEN TO THE DEALER FOR DIAGNOSTIC TESTING. THE TECHNICIAN STATED THAT THE POWER STEERING MODULE WOULD HAVE TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE APPROXIMATE FAILURE MILEAGE WAS 149,000."

- 2004 Chevrolet Malibu customer complaint, received by New GM at least as early as February 25, 2013: "MAKING LEFT HAND TURN POWER STEERING FAILED, ALMOST CAUSED ME TO RUN UP OVER CURB, VERY VERY HARD TO STEER, HAPPENS FAST LIGHT ON DASH STEERING GONE! BOUGHT CAR USED ON 2/16/13 STEERING FAILED FIRST TIME ON 2/17/13 TOOK BACK TO DEALER ON 2/18/13 DEALER SAID THEY REPLACED POWER STEERING MOTOR.CAR SEEMED OK FOR ABOUT A WEEK, THEN POWER STEERING FAILED AGAIN ON 2/24/13 TURNING LEFT LOW SPEED IN MY DRIVEWAY. CAR GOING BACK TO DEALER TODAY 2/25/13."

- 2008 Chevrolet Malibu customer complaint, received by New GM at least as early as March 7, 2013: "THE CONTACT OWNS A 2008 CHEVROLET MALIBU. THE CONTACT STATED THAT WHILE DRIVING APPROXIMATELY 50 MPH, THE POWER STEERING WARNING LIGHT ILLUMINATED AND THE VEHICLE BECAME DIFFICULT TO STEER. THE VEHICLE WAS ABLE TO BE DRIVEN

TO THE DEALER WHERE THE STEERING MODULE WAS REPLACED. THE CONTACT ALSO MENTIONED THAT THE VEHICLE WAS PREVIOUSLY REPAIRED TWICE UNDER A MANUFACTURER'S RECALL FOR THE STEERING COLUMN. THE VEHICLE WAS REPAIRED. THE MANUFACTURER WAS CONTACTED ABOUT THE FAILURE. THE FAILURE MILEAGE WAS 59,854."

- 2005 Chevrolet Malibu customer complaint, received by New GM at least as early as April 1, 2013: "MY POWER STEERING HAS GONE COMPLETLY OUT. I HAVE MADE SEVERAL COMPLAINTS TO GM REGARDING THIS MATTER. GM HAS ACKNOWLEDGED THE PROBLEM AND HAS SENT OUT LETTERS ADVISING CUSTOMERS WITH VINS 5F10001-5F250216 (TECHNICAL BULLETIN #07126) OF SPECIAL COVERAGE. GM HAS ALSO SENT ME A LETER ADVISING ME THEY WILL FIX THE PROBLEM IF MY VEHICLE IS 10YR OR 160K. MY PROBLEM DIDNT EXSIST AT THAT TIME. I NOW HAVE 212K MILES. I TOOK MY VEHICLE TO THE DEALER (WALLY EDGAR) AND WAS DENIED COVERAGE. ESTIMATED COST WAS $900 FOR REPAIRS. GM KNEW YEARS AGO THAT THEY HAD A PROBLEM WITH THE POWER STEERING, AND IT WAS A MATTER OF TIME BEFORE THE STEERING WAS TO STOP WORKING. REGARDLESS OF THE MILES. THE STEERING WAS GOING OUT AT SOME POINT.THAT IS MY ARGUMENT. I JUST WANT MY POWER STEERING FIXED."

- 2006 Chevrolet Malibu customer complaint, received by New GM at least as early as May 11, 2013: "STEERING LOCKED UP WHEN I WAS EXITING THE HIGHWAY.  I WAS GOING ABOUT 45 MILES AN HOUR. I HEARD THE WARNING BELL DING AND THE WARNING DISPLAYED 'POWER STEERING FAILURE.' I ALMOST CRASHED BECAUSE I COULDN'T STEER.  IT TOOK ALL THE POWER I COULD MUSTER TO STEER.  IF MY WIFE WOULD HAVE BEEN DRIVING IT WOULD HAVE KILLED HER. . . . AS FOR THE POWER STEERING FAILURE I TOOK IT TO THE CHEVY DEALERSHIP AND THEY SAID THAT THEY COULD NOT DUPLICATE IT.  IT HAPPENED ABOUT A DOZEN TIMES SO FAR AND THE DEALERSHIP SHRUGS THEIR SHOULDERS AND SAYS 'IT DIDN'T DO IT FOR ME' . . . . IS SOMEBODY GOING TO DO SOMETHING ABOUT THIS? OR DO WE JUST HAVE TO HAVE ENOUGH FATALITIES TO FORCE SOMETHING TO HAPPEN?"

- 2004 Chevrolet Malibu customer complaint, received by New GM at least as early as May 23, 2013: MY DAUGHTER WAS DRIVING TO SCHOOL THIS MORNING, AND EVERYTHING SEEMED TO BE FINE. SHE PULLED OUT OF OUR NEIGHBORHOOD AND INTO THE TURNING LANE ON A FAST MOVING STREET TO TURN INTO HER SCHOOL PARKING LOT. AS SHE WENT TO TURN, THE STEERING WHEEL LOCKED UP RIGHT AS SHE WAS TURNING INTO ONCOMING TRAFFIC. SHE SAID IT TOOK EVERYTHING IN HER TO TURN THE STEERING WHEEL ENOUGH JUST SO SHE COULD GET ONTO THE CURB AND OUT OF THE WAY. SHE THEN WENT TO PARK AND COULD BARELY MAKE IT INTO A PARKING SPACE. SHE SAID WHEN SHE FIRST STARTED TO TURN, A SOUND WENT OFF; AND A GOLD WRENCH SIGN

APPEARED UNDERNEATH HER RPMS. . . . HER, MY OTHER DAUGHTER, AND MY FRIEND'S TWO KIDS WHO WERE ALSO IN THE CAR, WERE EXTREMELY SHAKEN AND ON THE VERGE OF TEARS. IT WAS A TERRIFYING EXPERIENCE FOR THEM ALL. MY MOST PRECIOUS THINGS IN LIFE WERE ALMOST IN A SERIOUS (PERHAPS EVEN DEADLY) ACCIDENT BECAUSE OF THIS POWER STEERING FAILURE. I KNOW THIS IS NOT THE FIRST TIME THIS HAS BEEN REPORTED BECAUSE I FOUND NUMEROUS ACCOUNTS OF THIS EXACT SAME THING HAPPENING ONLINE. IT'S TIME CHEVROLET FINALLY STEPS UP, TAKES RESPONSIBILITY FOR THIS, AND RECALLS ALL THESE VEHICLES TO GET THIS POWER STEERING FAILURE FIXED BEFORE IT TAKES A LIFE (OR LIVES)!"

- 2007 Chevrolet Malibu customer complaint, received by New GM on June 11, 2013: "THE POWER STEERING WENT OUT WITH NO WARNING IN THE MIDDLE OF A RIGHT TURN.  THIS IS VERY DANGEROUS.  I LOOKED ON THE INTERNET AND THERE ARE A TON OF COMPLAINTS ABOUT THIS.  I SUGGEST YOU PEOPLE GET A RECALL NOTICE FROM GM QUICKLY.  GET MOVING PRONTO......LOTS OF ACCIDENTS AND NEAR ACCIDENTS."

- 2007 Chevrolet Malibu customer complaint, received by New GM on July 2, 2013: "DRIVING [sic] DOWN THE ROAD AND THE STEERING JUST STOPED WORKING, IT WAS VERY HARD TO STEER, THIS NOT SAFE AT ALL, DOES SOME ONE HAVE TO DIE BEFORE THEY DO A RECALL."

- 2010 Pontiac G6 customer complaint, received by New GM on July 9, 2013: "THE CONTACT OWNS A 2010 PONTIAC G6. THE CONTACT STATED THAT THE STEERING WHEEL LOCKED WHILE DRIVING 35 MPH. WHEN THE FAILURE OCCURRED THE CONTACT LOST CONTROL OF THE VEHICLE, PROCEEDED THROUGH THE INTERSECTION AND CRASHED INTO A CURB. THE STEERING WHEEL REGAINED NORMAL FUNCTION AFTER THE VEHICLE WAS RESTARTED.  THE VEHICLE WAS TAKEN TO THE DEALER FOR DIAGNOSTIC TESTING WHO CONFIRMED THE FAILURE WAS IN THE STEERING COLUMN POWER ASSIST."

- 2006 Chevrolet Malibu Maxx customer complaint, received by New GM on August 17, 2013: "I ALSO HAVE PROBLEMS WITH MY 06 MALIBU MAXX.  WHEN ACCELERATING ONTO THE INTERSTATE, . . . I HEAR DING, DING, DING [ ] THEN THE STEERING LOCKS UP. CANNOT MOVE THE STEERING WHEEL. ALSO HAPPENS WHEN MAKING SHARP TURNS. ALMOST THREW ME INTO A DITCH ONCE AND ALMOST BOUNCED ME INTO THE GUARD RAIL ONCE. I AM DISAPPOINT[ED] THAT CHEVROLET HAS NOT RECALLED THIS PROBLEM. IT IS A TRUE SAFETY HAZARD. I AM A LOYAL PURCHASER OF CHEVY PRODUCTS, AND I EXPECT CHEVROLET TO STAND BY ME AS WELL. APPEARS THIS IS A WELL DOCUMENTED ISSUE BY ALL THE COMPLAINTS I READ."

- 2006 Chevrolet Malibu customer complaint, received by New GM on August 21, 2013: "THE CONTACT OWNS A 2006 CHEVROLET MALIBU. THE CONTACT

STATED THAT THE STEERING WHEEL FAILED WHILE DRIVING 20 MPH. THE STEERING WHEEL BECAME HARD TO TURN AS THE POWER STEERING LIGHT ILLUMINATED. THE CONTACT TURNED THE ENGINE OFF FOR A MOMENT AND THE STEERING WHEEL BRIEFLY RETURNED TO NORMAL FUNCTION BEFORE THE FAILURE RECURRED. THE VEHICLE WAS TAKEN TO THE MECHANIC AND A DIAGNOSTIC WAS PERFORMED, WHICH LOCATED THE FAILURE AT THE POWER STEERING MOTOR. THE MANUFACTURER DENIED ASSISTANCE WITH THE REPAIR, BECAUSE THE VEHICLE HAD EXCEEDED THE POWER STEERING MOTOR REPLACEMENT MILEAGE. THE VEHICLE WAS NOT REPAIRED. THE FAILURE AND CURRENT MILEAGE WAS 156,000."

- 2005 Pontiac G6 customer complaint, received by New GM on August 22, 2013: "THE CONTACT OWNS A 2005 PONTIAC G6. THE CONTACT STATED THAT WHILE DRIVING APPROXIMATELY 20 MPH, THE STEERING WHEEL BECAME DIFFICULT TO MANEUVER. THE POWER STEERING WARNING MESSAGE APPEARED ON THE RADIO DISPLAY. THE VEHICLE WAS TAKEN TO AN INDEPENDENT MECHANIC FOR DIAGNOSIS. THE MECHANIC WAS UNABLE TO DIAGNOSE THE FAILURE. THE FAILURE RECURRED INTERMITTENTLY AT VARIOUS SPEEDS. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE VEHICLE WAS NOT REPAIRED."

- 2004 Chevrolet Malibu customer complaint, received by New GM on October 15, 2013: "THE CONTACT OWNS A 2004 CHEVROLET MALIBU. THE CONTACT STATED THAT THE STEERING WHEEL LOCKED AND BECAME HARD TO TURN, WHILE TURNING TO THE RIGHT. THE STEERING POWER WARNING LIGHT ILLUMINATED, WHILE THE FAILURE OCCURRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE VEHICLE WAS NOT REPAIRED."

51.    Throughout the years in which it received thousands of these complaints, Old and New GM marketed GM brand vehicles as safe. For example, in a section called "Safety," Old GM's Chevrolet website stated:

> **OUR COMMITMENT**
>
> "Your family's safety is important to us. Whether it's a short errand around town or a cross-country road trip, Chevrolet is committed to keeping you and your family safe – from the start of your journey to your destination. That's why every Chevrolet is designed with a comprehensive list of safety and security features to help give you peace of mind."

52.    Similarly, Old GM promoted its Saturn vehicle line with television advertising tag lines like, "Putting people first," and, "Saturn. People First." Saturn's print ad campaign featured

advertisements with statements such as the following: "Need is where you begin. In cars, it's about things like reliability, durability and, of course, safety. That's where we started when developing our new line of cars." In sum, in order to increase sales, Old GM touted the safety of its vehicles, and New GM did nothing to correct the false representations of safety to the millions of vehicle owners whose cars were affected by the EPS defect. Further, throughout the existence of both Old and New GM, GM dealerships continued to sell "certified pre-owned cars" that still had the defective EPS system. New GM, which profited indirectly from these sales, certified the safety of these vehicles to the public, explaining that the certification process involved testing of over a hundred components, including the power steering system. This safety certification was made despite many of the affected vehicles still having the original defective EPS motor system. As a result, many owners and users of the affected vehicles purchased and drove the vehicles in reliance upon these safety representations.

53.     New GM finally recalled the 2003-07 Saturn ION, certain model year Chevrolet Malibu, the 2005 Pontiac G6, and some 2006 and 2008-09 model year G6s in 2014, even though the "incidents per thousand vehicles" ("IPTV") in July 2010 for these models exceeded the incidents per thousand vehicles for the Cobalt recalled all the way back in 2010. In fact, back in June 2009, Old-to-New GM Field Performance Engineers involved with the Investigation Status Review ("ISR") committee reviewed data on field reports of loss of power steering, and this data indicated that the IPTV for the Malibu and G6 was much greater than that of the Cobalt.

54.     After announcing the March 31, 2014 recall, Jeff Boyer, New GM's Vice President of Global Vehicle Safety, acknowledged that New GM recalled only some of these same vehicle models in 2010 for the *same issue,* but that New GM "did not do enough."

55.     Recall 14V-153 provided for the following repairs based on model:

- 2004-2007 Saturn ION, 2009-2010 Chevrolet HHR, and 2010 Chevrolet Cobalts – Replace power steering motor;

- 2004-2006 Chevrolet Malibu and Malibu Maxx, 2005-2006 Pontiac G6, 2008-2009 Chevrolet Malibu, 2008-2009 Pontiac G6, and 2008-2009 Saturn Aura (3/1/2008 – 6/27/2008) – Replace torque assembly;

- 2008 Chevrolet Malibu, 2008 Pontiac G6, and 2008 Saturn Aura (2/1/2008 – 2/28/2008) – Replace torque assembly and power steering control unit;

- Saturn Aura (10/1/2007-1/31/2008) – Replace power steering motor control unit.

56.    Notably, even as the EPS issue was finally winding its way through New GM's internal field action decision-making committees in late 2013, Product Investigations Engineers were still focused on cost-cutting opportunities in the implementation of the recall procedures.  For example, in December 2013, Old-to-New GM Products Investigation Engineer Eric Buddrius highlighted the cost-cutting benefits of only replacing the torque sensor in the defective steering systems as opposed to replacing the entire steering column (a procedure that was commonly used by GM dealers when addressing individual EPS-defect-related complaints): "Currently we replace the steering column at a cost of $302.66 per column.  In the attached presentation on slides 22 and 33 you can see how this cost would add up in a field action. In the aftermarket there is a torque sensor available that would be less expensive.  We would like to discuss replacing only the torque sensor."

**C. The Body Control Module Defect (Recall No. 14V252)**

57.    On May 14, 2014, New GM issued a safety recall of approximately 2.4 million model year 2004-2012 Chevrolet Malibu, 2004-2007 Malibu Maxx, 2005-2010 Pontiac G6, and 2007-2010 Saturn Aura vehicles with a dangerous brake light defect.

58.    In the affected vehicles, the brake lamps may fail to illuminate when the brakes are applied or illuminate when the brakes are not engaged; the same defect can disable cruise control, traction control, electronic stability control, and panic brake assist operation, thereby increasing

the risk of collisions and injuries

59.    Once again, New GM knew of the dangerous brake light defect for years before it took anything approaching the requisite remedial action. Despite repeated crashes between the time or shortly after New GM came into existence and the recall date, New GM did not recall all 2.4 million vehicles with the defect until May 2014.

60.    According to New GM, the brake defect originates in the Body Control Module connection system. "Increased resistance can develop in the [Body Control Module] connection system and result in voltage fluctuations or intermittency in the Brake Apply Sensor (BAS) circuit that can cause service brakes lamp malfunction." The result is brake lamps that may illuminate when the brakes are not being applied and may not illuminate when the brakes are being applied.

61.    The same defect can also cause the vehicle to get stuck in cruise control if it is engaged, or cause cruise control to not engage, and may also disable the traction control, electronic stability control, and panic-braking assist features.

62.    New GM now acknowledges that the brake light defect "may increase the risk of a crash."

63.    New GM knew from the date of its inception that as early as September 2008, NHTSA opened an investigation for MY 2005-2007 Pontiac G6 vehicles involving allegations that the brake lights may turn on when the driver does not depress the brake pedal and may not turn on when the driver does depress the brake pedal.

64.    New GM knew that during an investigation of the brake light defect in 2008, Old GM had discovered elevated warranty claims for the brake light defect for MY 2005 and 2006 vehicles built in January 2005, and found "fretting corrosion in the [Body Control Module] C2 connector was the root cause" of the problem.  New GM was aware that Old GM and its part supplier Delphi decided that applying dielectric grease to the [Body Control Module] C2 connector

would be "an effective countermeasure to the fretting corrosion." Beginning in November of 2008, the Company began applying dielectric grease in its vehicle assembly plants.

65.     New GM also knew that on December 4, 2008, Old GM issued a Technical Service Bulletin recommending the application of dielectric grease to the Body Control Module C2 connector for the MY 2005-2009 Pontiac G6, 2004-2007 Chevrolet Malibu/Malibu Maxx, 2008 Malibu Classic, and 2007-2009 Saturn Aura vehicles. One month later, in January 2009, Old GM recalled only a small subset of the vehicles with the brake light defect – 8,000 MY 2005-2006 Pontiac G6 vehicles built during the month of January 2005.

66.     Not surprisingly, the brake light problem was far from resolved.

67.     In October 2010, New GM released an updated Technical Service Bulletin regarding "intermittent brake lamp malfunctions," and added MY 2008-2009 Chevrolet Malibu/Malibu Maxx vehicles to the list of vehicles for which it recommended the application of dielectric grease to the Body Control Module C2 connector.

68.     In September of 2011, New GM received an information request from Canadian authorities regarding brake light defect complaints in vehicles that had not yet been recalled. Then, in June 2012, NHTSA provided New GM with additional complaints "that were outside of the build dates for the brake lamp malfunctions on the Pontiac G6" vehicles that had been recalled.

69.     In February of 2013, NHTSA opened a "Recall Query" in the face of 324 complaints "that the brake lights do not operate properly" in Pontiac G6, Malibu, and Aura vehicles that had not yet been recalled.

70.     In response, New GM asserts that it "investigated these occurrences looking for root causes that could be additional contributors to the previously identified fretting corrosion," but that it continued to believe that "fretting corrosion in the [Body Control Module] C2 connector" was the "root cause" of the brake light defect.

71.     In June of 2013, NHTSA upgraded its "Recall Query" concerning brake light problems to an "Engineering Analysis."

72.     In August 2013, New GM found an elevated warranty rate for Body Control module C2 connectors in vehicles built after Old GM had begun applying dielectric grease to Body Control Module C2 connectors at its assembly plants in November of 2008. In November of 2013, New GM concluded that "the amount of dielectric grease applied in the assembly plant starting November 2008 was insufficient…."

73.     Finally, in March of 2014, "[New] GM engineering teams began conducting analysis and physical testing to measure the effectiveness of potential countermeasures to address fretting corrosion. As a result, New GM determined that additional remedies were needed to address fretting corrosion."

74.     On May 7, 2014, New GM finally decided to conduct a safety recall.

**COUNT I: NEGLIGENCE**

75.     Plaintiff hereby incorporates by reference each and every paragraph set forth in this Complaint as if fully copied and set forth at length herein.

76.     Under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement wherein New GM acquired certain Old GM assets, New GM assumed product liability for crashes involving Old GM vehicles causing personal injury, loss of life or property damages. New GM also acquired knowledge of Old GM's activities and the electronic power defect, and other serious defects, via the mind of the employees, officers, managers, books and records obtained and/or acquired as a result of the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement and subsequent Sale Order.  Thus, the duties of Old GM are part of the foundation for the product liability assumed by New GM.  Further, Named Plaintiff's claims stem from a crash involving an Old GM vehicle that caused Plaintiff personal injury and property

damage and New GM is therefore liable to the Named Plaintiff.

77.    Old GM owed Named Plaintiff a duty to design, manufacture, fabricate, assemble, inspect, market, distribute, sell, and/or supply products in such a way as to avoid harm to persons using them such as the Named Plaintiff.

78.    Old GM and New GM owed the Named Plaintiff a duty to detect known safety defects in GM vehicles.

79.    Old GM and New GM owed the Named Plaintiff a duty, upon discovering the safety defect, to provide thorough notice of the defect, including a warning that the defective vehicles were not safe and should not be driven until an appropriate repair procedure was performed.

80.    Old GM and New GM owed the Named Plaintiff a duty, upon discovery of the safety defect, to ensure that an appropriate repair procedure for the defective EPS system was developed and made available to drivers.

81.    Old GM and New GM knew that their customers, such as the Named Plaintiff, expect that the company will employ all reasonable efforts to detect safety defects, warn drivers of their existence, and develop and make available an appropriate repair procedure.

82.    The duties of Old GM and New GM to discover, provide notice of, and provide repair procedures for safety related defects exist for the benefit of the Named Plaintiff and other drivers of GM brand vehicles, and Old-to-New GM employees breached these duties to the Named Plaintiff.  Old GM and New GM were aware that by providing maintenance and repair information and assistance, including through its authorized dealerships, Old GM and New GM had a responsibility to the Named Plaintiff and other drivers to take the reasonable measures listed above.

83.    By reason of New GM's assumption of product liability under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement for crashes involving Old GM vehicles causing personal injury, loss of life or property damages, the failures of Old GM described

above that contributed to or were causally connected to the injuries sustained by Named Plaintiff were among the product liabilities of Old GM assumed by New GM.

84.    Independent of any failures by Old GM as described herein, New GM breached its duties to the Named Plaintiff by failing to provide appropriate notice of and repair procedures for the Named Plaintiff's Defective Vehicle.  In doing so, New GM departed from the reasonable standard of care required of it.

85.    It was foreseeable that if the New GM did not provide appropriate notice and repair procedures for the Defective Vehicles, the Named Plaintiff and other drivers would be endangered.

86.    The Named Plaintiff's injuries were reasonably foreseeable to Old GM and New GM.

87.    The Named Plaintiff could not through the exercise of reasonable diligence have prevented the injuries caused by Old GM and New GM's negligence and gross negligence.

88.    Old GM's and New GM's acts and omissions, when viewed objectively from the actor's standpoint, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.  Old GM and New GM nevertheless proceeded with conscious indifference to the rights, safety and welfare of others.

89.    As will be shown at trial, all the foregoing knowledge of Old GM in all the preceding paragraphs was inherited by or is imputable to New GM within the meaning of the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al.*, *f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG).

90.    As a direct and proximate result of the foregoing acts and omissions, the Named Plaintiff suffered severe and permanent physical injuries.  The Named Plaintiff has endured, and will continue to endure, substantial pain and suffering.  The Named Plaintiff has incurred

significant expenses for medical care and treatment, and will continue to incur such expenses in the future.  The Named Plaintiff has lost past earnings and has suffered a loss of earning capacity. The Named Plaintiff has suffered and will continue to suffer economic loss, and has otherwise been physically and economically injured.  These injuries and damages are permanent and will continue into the future.  The Named Plaintiff seeks actual and punitive damages from Defendant as alleged herein.

WHEREFORE, the Named Plaintiff prays for judgment in Count I against Defendant for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, costs herein expended, punitive damages to punish and deter any such conduct in the future and such other relief as the Court deems just and proper under the circumstances.

## COUNT II: STRICT LIABILITY

91.    Plaintiff hereby incorporates by reference each and every paragraph set forth in this Complaint as if fully copied and set forth at length herein.

92.    Old GM and New GM, at all times relevant to this action, were engaged in the design, testing, manufacture, distribution, and sale of automobiles, including the Defective Vehicles.

93.    The Defective Vehicles were expected to and did reach users and consumers without substantial change in the condition in which they were sold.

94.    The Defective Vehicles were in a defective condition creating risk of harm to a user or a consumer, including the Named Plaintiff.

95.    The Defective Vehicles were and are unreasonably dangerous and defective in design or formulation for their intended use and posed a risk of serious injury which could have been reduced or avoided, *inter alia*, by the adoption of a feasible reasonable alternative design. There were safer alternative designs for the like products.

96.     The Defective Vehicles' EPS systems, as designed, manufactured, marketed, and supplied, were defective due to inadequate control software and/or poorly designed valves, gaskets, or other parts or design within the EPS/steering unit that rendered the vehicles defective and unsafe. Indeed, safer alternatives were available and would have been effective to ameliorate the defects that resulted in the Named Plaintiff's injuries.

97.     The defects set forth herein caused the Named Plaintiff's injuries.

98.     The Named Plaintiff's injuries and losses were directly and proximately caused by Old GM's designing, manufacturing, fabricating, assembling, inspecting, marketing, distributing, selling and/or supplying the Defective Vehicle in a defective condition for which it is strictly liable to the Named Plaintiff pursuant to Restatement (Second) of Torts § 402A because that liability was assumed by New GM.

99.     The Named Plaintiff's injuries were caused by Old GM's designing, manufacturing, fabricating, assembling, inspecting, marketing, distributing, selling and/or supplying the Defective Vehicles without proper and adequate warnings, instructions, and/or guidelines for safe use for which New GM is strictly liable to the Named Plaintiff because that liability was assumed by New GM.

100.    By reason of New GM's assumption of product liability under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement for crashes involving Old GM vehicles causing personal injury, loss of life or property damage, the failures of Old GM described above that contributed to or were causally connected to the injuries sustained by the Named Plaintiff were among the product liabilities of Old GM assumed by New GM, and New GM is therefore liable for Named Plaintiff's injuries stemming from the September 25, 2009 crash. Independent of any failures by Old GM as described herein, New GM breached its duties owed to the Named Plaintiff as described herein.

101.    As will be shown at trial, all the foregoing knowledge of Old GM in all the preceding paragraphs was inherited by or is imputable to New GM within the meaning of the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al., f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG).

102.    As a direct and proximate result of the foregoing acts and omissions, the Named Plaintiff suffered severe and permanent physical injuries.  The Named Plaintiff has endured, and will continue to endure, substantial pain and suffering.  The Named Plaintiff has incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the future.  The Named Plaintiff has lost past earnings and has suffered a loss of earning capacity. The Named Plaintiff has suffered and will continue to suffer economic loss, and has otherwise been physically and economically injured.  These injuries and damages are permanent and will continue into the future.  The Named Plaintiff seeks actual and punitive damages from Defendant as alleged herein.

WHEREFORE, the Named Plaintiff prays for judgment in Count II against Defendant for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, costs herein expended, punitive damages to punish and deter any such conduct in the future and such other relief as the Court deems just and proper under the circumstances.

### COUNT III: FRAUD BY NON DISCLOSURE

103.    Plaintiff hereby incorporates by reference each and every paragraph set forth in this Complaint as if fully copied and set forth at length herein.

104.    As discussed above, Old GM began receiving customer complaints regarding loss of power steering in certain of the Defective Vehicles as early as 2003, and neither Old nor New GM advised customers that a defect affecting motor vehicle safety existed in said vehicles

until Recall No. 14V-153 in 2014.

105.    As set forth above, Old GM and New GM intentionally concealed or failed to disclose material facts related to the electronic power steering defects from the Named Plaintiff, the public, and NHTSA.  In addition, Old GM and New GM failed to timely disclose the other serious and potentially life-threatening defects in the Defective Vehicles within such time and in such manner as to prevent the Named Plaintiff's injuries and/or death.

106.    Additionally, New GM possessed independent knowledge of the defects in the Named Plaintiff's Defective Vehicle and the need to undertake multiple design steps to resolve those defects to prevent injury and economic harm to vehicle owners such as Plaintiff.  This knowledge was based, in part, on the information from records, files, reports and other documents and materials regarding the defective EPS system maintained by Old GM, all of which were included in the assets purchased by New GM during the bankruptcy sale.

107.    New GM had a duty to disclose the facts to the Named Plaintiff and New GM knew: (1) that the Named Plaintiff was ignorant of the material facts that New GM did not disclose and/or intentionally concealed; and (2) the Named Plaintiff did not have an equal opportunity to discover the material facts that New GM did not disclose and/or intentionally concealed.  New GM's fraud, fraudulent concealment and fraudulent non-disclosure were all components of the subject incident of the Named Plaintiff.

108.    By failing to disclose these material facts, New GM intended to induce the Named Plaintiff to take some action or refrain from acting.

109.    The Named Plaintiff relied on New GM's non-disclosure and was injured as a result of acting without knowledge of the undisclosed facts.  Had adequate notice and instructions been provided, Named plaintiff would not have driven the Defective Vehicle, and would not have been at risk of harmful injuries described herein.  The Defendant failed to provide warnings of such

risks and dangers and failed to fix the defective condition in a timely manner.

110.    As a direct and proximate result of the foregoing acts and omissions, the Named Plaintiff suffered severe and permanent physical injuries.  The Named Plaintiff has endured, and will continue to endure, substantial pain and suffering.  The Named Plaintiff has incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the future.  The Named Plaintiff has lost past earnings and has suffered a loss of earning capacity. The Named Plaintiff has suffered and will continue to suffer economic loss, and has otherwise been physically and economically injured.  These injuries and damages are permanent and will continue into the future.  The Named Plaintiff seeks actual and punitive damages from Defendant as alleged herein.

WHEREFORE, the Named Plaintiff prays for judgment in Count III against Defendant for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), which is fair and reasonable, costs herein expended, punitive damages to punish and deter any such conduct in the future and such other relief as the Court deems just and proper under the circumstances.

## COUNT IV: STATUTORY ACTIONS

111.    Plaintiff hereby incorporates by reference each and every paragraph set forth in this Petition as if fully copied and set forth at length herein.

112.    For all claims that are subject to a state statutory regime, those claims are brought under the applicable state statutes as follows:

- For those claims that are subject to Texas's product liability statute(s), those claims are brought pursuant to Tex. Civ. Prac. & Rem. Code Ann. §§ 82.001 *et seq.*

## COUNT V: PUNITIVE DAMAGES

113.    Plaintiff hereby incorporates by reference each and every paragraph set forth in this

Complaint as if fully copied and set forth at length herein.

114.    Plaintiff would further show that the clear and convincing evidence in this case will prove that New GM acted with reckless disregard of the health and safety of others in that when it knew or should have known that there was the extreme risk of danger vis-a-vis the use and operation of the Defective Vehicle and other Old GM and New GM vehicles with the same defect, and that New GM nevertheless proceeded with indifference to the rights, safety, or welfare of others, including Plaintiff.  Therefore, Plaintiff seeks punitive damages against New GM.

115.    Alternatively, Plaintiff would further show that the clear and convincing evidence in this case will prove that New GM acted intentionally and with malice in that when it knew or should have known that there was the extreme risk of danger vis-a-vis the use and operation of Plaintiff's Defective Vehicle and other Old GM and New GM vehicles with the same defect, and that New GM nevertheless proceeded with indifference to the rights, safety, or welfare of others, including the Plaintiff.  Therefore, Plaintiff seeks punitive damages against New GM.

116.    New GM also acquired certain duties with regard to vehicles in production and on the road at the time of the Sale and Purchase Agreement – duties it breached egregiously – as has been well-publicized and for which it has been justifiably criticized. These duties included, but are not limited to, those arising under the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. § and the Transportation Recall Enhancement, Accountability and Documentation Act, 49 U.S.C. §§ 30101-30170. GM was fined $35 Million by NTSHA for its delayed reporting of the ignition switch problem and violating federal safety laws.

117.    New GM's liability for damages is attributable to its own post-sale conduct and failure to timely remedy and/or recall vehicles it knew had deadly defects, even with regard to vehicles manufactured and sold prior to the Sale and Purchase Agreement.

118.    Defendant sold the Defective Vehicles, including the Plaintiff's vehicle, to

consumers without doing adequate testing to ensure that the Defective Vehicles were reasonably safe for their use and intended purposes.

119.    Defendant knew of the Defective Vehicles' defective and unreasonably dangerous nature, but continued to manufacture, market, distribute, and sell the products so as to maximize sales and profits at the expense of the health and safety of the public.

120.    Defendant, through its conduct in designing, testing, manufacturing, assembling, marketing, selling, and failing to adequately repair the Plaintiff's vehicle purchased and/or used by Plaintiff, demonstrated willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifferent to consequences, thereby justifying an award of punitive damages.

WHEREFORE, Plaintiff respectfully requests that in addition to actual damages, she be awarded an additional amount as and for punitive damages in her favor and against Defendant, in an amount which will serve to punish Defendant and deter Defendant and others from like conduct in the future.

## JURY DEMAND

121.    Plaintiff hereby demands a trial by jury.

## PRAYER

122.    For the foregoing reasons, the Named Plaintiff prays that the Defendant be cited to appear and answer herein, and that upon final hearing of the cause, judgment be entered for the Plaintiff against Defendant for actual damages, as alleged, and exemplary damages, subject to proof and the limitations of the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in Motors Liquidation Company, et al., f/k/a General Motors Corp., et al., Case No. 09-50026 (REG); together with pre-judgment interested (from the date of injury through the date of judgment) at the maximum rate allowed by

law; post-judgment interest at the legal rate, costs of court; and such other and further relief to which Named Plaintiff may be entitled at law or in equity.

Respectfully submitted,

**THE POTTS LAW FIRM, LLP**

By: */s/ Eric G. Jensen*                                    
        Eric G. Jensen MO# 43094
        Derek H. Potts MO# 44882
        3737 Buffalo Speedway, Suite 1900
        Houston, Texas 77098
        (713) 963-8881 (telephone)
        (713) 583-5388 (facsimile)
        ejensen@potts-law.com
        dpotts@potts-law.com

        **ATTORNEYS FOR PLAINTIFF**